Allan C. and Ida Davis Hall v. Commissioner.
Hall v. Commissioner
Docket No. 8596.
United States Tax Court
1949 Tax Ct. Memo LEXIS 108; 8 T.C.M. (CCH) 725; T.C.M. (RIA) 49201; August 17, 1949
*108 Taxpayer, engaged in the operation of sandstone quarries for the removal therefrom of grindstone and manufacturing same into various sizes for use as abrasives in the manufacture of cutting tools, held, not entitled to allowance for depletion on the discovery basis. Roger K. Powell, Esq., 17 S. High St., Columbus, Ohio, and Joseph S. Gill, Esq., for the petitioners. W. W. Kerr, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax in the amount of $4,992 for the year 1941. The only question to be determined is whether the petitioners are entitled to a deduction in 1941 for depletion on the discovery basis of certain sandstone deposits from which "grindstone" was removed. Findings of Fact The petitioners are husband and wife and reside in Marietta, Ohio. Their return for the year 1941 was filed with the collector of internal revenue for the 11th district of Ohio. Allan C. Hall, hereinafter referred to as the petitioner, is engaged in the business of removing from sandstone deposits, and manufacturing, grindstones for use as abrasives in the manufacture of *110 edged tools, such as files, machine knives, saws, cutting guides, carpenter tools, and others. The business is conducted under the name of The Hall Grindstone Company, hereinafter referred to as the Company. The Company was established in 1910. Petitioner became associated with the business in 1911 and in the taxable year and for some years prior thereto was the sole proprietor thereof. Sandstone suitable for industrial grindstones is found in Washington County, Ohio, and several counties surrounding Washington County, including several counties in West Virginia. During 1941 petitioner was removing grindstone from three sandstone ledges, the operations being designated as Quarry No. 4, Quarry No. 5, and Quarry No. 7, respectively, all located in Washington County, Ohio. The steps taken in locating sandstone suitable for grindstone and removal thereof are as follows: Land, upon which outcroppings of sandstone appear, is surveyed to determine its suitability for the operation of a quarry, one requirement being an available water supply. Pieces of the outcroppings of sandstone are broken off with stone picks, which pieces of sandstone are subjected to various tests. All sandstone *111 is not suitable for grindstone, which must be within certain limitations of stiffness and must contain a cutting grit. If the results of the survey and tests are favorable, a further test is sometimes made by drilling by hand, possibly through the ledge after enough of the overlying surface ground has been removed to permit working on the ledge. It is always necessary in exploiting sandstone deposits to strip or remove a varying amount of overburden from the stone. After the tests are completed, equipment needed for quarrying operations is moved to the location. A road is built and a water system installed. After the ledge is uncovered the grindstone is removed by the use of pneumatic drills mounted on the end of a revolving channeling machine. The stones are channeled in all diameters up to 84 inches to a depth usually not to exceed 40 inches. The stones are cut in circular form. After the depth is penetrated, the block is freed by the use of a pneumatic drill and a charge of explosive. The quarry blocks, sometimes weighing up to 10 tons, are lifted from the quarry floor, inspected and given a "quarry dressing." If the stone is of no value it is discarded. Only the portions of the *112 stone having commercial value are claimed. After the "quarry blocking" is finished, the stone is transported to the mill owned and operated by the Company. The blocks are there sawed to the desired size. The stones are then turned on lathes to exact dimensions after which they are loaded on cars and shipped or placed in storage. Since 1911, the Company has opened about 47 quarries with the use of full steam equipment, the greater number of which proved to be worthless. About 90 per cent of all grindstone produced by the Company was taken from not more than six of such openings or quarries. In 1916, after having made the usual preliminary tests, the Company purchased about 23 1/2 acres of land in Warren Township, Washington County, Ohio, at a cost of $2,500. The sandstone ledge in such property was opened and quarry operations were commenced in the same year. The operation was designated as Quarry No. 4. There were outcroppings of sandstone on property adjoining the above purchased property, which adjoining property is hereinafter referred to as the Morris land. In about 1923, a lease was acquired covering the Morris land. Two openings were made on the north side of such land *113 approximately one-fifth to one-quarter mile from the place where the quarry operations later crossed over the line from the Company's land onto the Morris land in 1938. The operations on the Morris land in 1923 were not successful and the lease was permitted to expire. In 1935 a second lease on the same Morris land was acquired. The terms of such lease are not in evidence. Quarry No. 4 on the Company's land was a consistent producer until sometime in 1938 when operations approached the Morris land. As operations neared the Morris land, the vein of grindstone in the ledge narrowed to a width of 40 feet, which was comparatively very narrow. At this point only one lift of stone, 38 inches in diameter and 16 inches thick, was made, which stones were called "dumpies." It was not know whether this defect in the ledge would continue onto the Morris land or whether the ledge therein would produce a good vein of stone. However, operations were continued during 1938 across the line between the two properties and onto the Morris land in the hope that good stone would be found. In 1939, quarry operations were carried on on both sides of the line between the Company's property and the Morris *114 land, but to a greater extent on the Morris land. As work proceeded on the Morris land, the vein improved gradually and has been a consistent producer since. The ledge in the Morris land was a continuation of the ledge in the Company's land. The operations on the Morris land were about a third of a mile from the location where quarry operations were started on the Company's land in 1916. The operations on the Morris land are also designated as Quarry No. 4. In the spring of 1941, the overburden removed from the ledge in the Morris land was about 65 feet deep. Several years later the overburden required to be stripped was 80 feet deep. The petitioner's brother, a graduate engineer, has been in the employ of the Company and/or petitioner for 25 years. He is now, and has been for some years, Superintendent. His duties, among others, consist of planning the work and production to satisfy the customers' needs and directing the foremen at the actual scene of operations. In about September, 1926, the petitioner's brother, together with another man, examined some outcroppings of sandstone on certain land located in Dunham Township, Washington County, Ohio. Their examination satisfied them *115 that the location was a prospective site for a grindstone quarry. Subsequently, petitioner went with them to such outcroppings and it was then decided to open a quarry there. Thereupon petitioner negotiated and obtained a lease from the owners of the land covering 375 acres, more or less, for a period of 25 years, beginning on the date of the lease, September 14, 1926, and ending September 14, 1951. Under the lease, the lessee, his heirs or assigns, were given the exclusive stone right, with full power, authority and privilege to quarry and manufacture grindstone and to remove the stone from any location on or from the tract of land leased, for which the lessee agreed to pay 50 cents per ton for all grindstone quarried, turned and shipped, with a minimum royalty of $100 a year, the $100 to be considered as payment for the first 200 tons of stone removed during each year. Quarry operations were commenced on such land in 1926 and in that year 196 tons of grindstone were removed. The first shipment of stones from the quarry was made in October, 1926. This operation was designated as Quarry No. 5. The overburden now stripped from the ledge is about 40 feet deep. As early as 1927 a ledge *116 of sandstone lying about 12 feet below ledge No. 5 was seen but it was not believed that a market for the stone in the lower ledge could be developed. The ledge was not worked until about 1932. The first grindstone was lifted therefrom in 1933. The operations in this ledge were designated as Quarry No. 7. Ledges No. 5 and No. 7 are separated by a layer of flint about 12 feet thick. After the grindstone in ledge No. 5 has been removed, requiring on the average four lifts of stone, the layer of flint lying on ledge No. 7 is then blasted out and removed so as to permit the channeling and lifting out of the grindstone in ledge No. 7. The Company produces for its trade grindstones of fine, medium, and coarse grains, and such grains are in different stiffnesses. Each ledge contains grindstone of different grade and quality. Grindstones produced from different ledges are sold for various purposes. In the manufacture of tools and implements, various grades and qualities of grindstones are required; for instance, for grinding files a hard stone is required, whereas in grinding the flat sides of saws other qualities of stone are required. In petitioners' return for 1941 a deduction for depletion *117 was claimed in the amount of $9,020. The deduction was disallowed with the following explanation: "It is held that the claimed deduction of $9,020.00, representing depletion allegedly sustained on sandstone quarries, does not constitute an allowable deduction from gross income under the provisions of section 23 (m), section 114, or any other section of the Internal Revenue Code or amendments thereto. The sum of $9,020.00 has accordingly been restored to income." In a letter dated December 1, 1943, addressed to the internal revenue agent in charge at Cincinnati, Ohio, in reference to the claimed deduction in the 1941 return, petitioner stated, in part, as follows: * * *
"I will give a brief outline of the grindstone business so that you can see my reasoning for claiming depletion. "The manufacturing of grindstones is restricted to a few small areas in the United States. One of the principal areas being in southeastern Ohio in which I operate. Grindstone from this section is shipped to all parts of the United States and Canada. The stones are used by large manufacturers for the grinding of machine knives, gun barrels, saws, files, steel plates, and miscellaneous steel tools *118 and cutting dies. "A grindstone must contain certain qualities that make it adaptable for grinding, these qualities being coarse or fine texture, firmness, free from cracks or seams, not too much metal particles, free from soft or bad places, silica of a cutting quality, and many other things have to be considered in making up grindstones. "In this business the acquisition of suitable quarries constitutes the vital asset. If we are successful in finding a good quarry or quarries our business continues. If we do not continue locating good quarries, and those we have are worked out or fail, the business cannot continue. In the last one hundred years probably four hundred quarries have been opened within a radius of fifty miles of Marietta, Ohio. Only a few of these quarries have been successful. Most have failed because the quality of stone was not suitable for any market or because the deposits were so defective that they could not be operated on a paying basis. The amount of stone in a paying quarry cannot be estimated. A prospective quarry may start working well and then may promptly fail. Even a quarry that has worked satisfactorily for a number of years may play out at any time. *119 When such failures occur they are attributable to a change in the nature of the stone. A ledge may become too hard or too soft. Or the cutting quality of the abrasive sand may change, or defects such as soap stone, flint, unevenness, sand pockets, cross grain may put in their appearance. "Almost continuously during the 32 years that I have been in business, and that is to say until the advent of the present war, we prospected continuously for new grindstone quarries, using a regular quarry equipment and an average of ten men. * * *" In reply to a letter under date of December 11, 1943, of the acting internal revenue agent in charge acknowledging petitioner's letter of December 1, 1943, and requesting more specific information than that contained in such letter, petitioner replied under date of December 23, 1943, in part, as follows: * * *
"In our letter of December 1, we stated to you that it was impossible to estimate the number of tons of good grindstone in any quarry. * * *
"We answer your questions of November 22, in part as follows: * * *
(f) Estimated recoverable tons in property: Cannot be determined. A grindstone quarry may fail at any time. A grindstone *120 quarry is erratic due to natural defects in the stone that are sometimes in evidence in sufficient quantity to destroy the quarry. At other times in evidence so that the quarry may just barely pay, and at other times a freedom of defects permits a highly profitable operation. (g) Depletion rate (c) divided by (f): Cannot answer. We do know however, that we have spent more than $5 per ton in labor, supplies, and equipment in prospecting since the beginning of the business. This prospecting cost has been absorbed by the price charged for the product except during those depression years and war years when prospecting has been eliminated either due to lack of business or lack of labor. * * *
(j) Depletion allowable for 1941: $2 per ton claimed based upon the necessity of selling raw material that we have discovered at a high cost and at a time when it is impossible to engage in more costly work relating to discovery." * * *
The net profit before depletion and taxes of the Company, the number of tons of grindstone shipped by it, and the number of tons of grindstone produced from the three quarries herein involved, as shown by the books of the Company, are as follows: *121 Net Profit be-
Tons from
Tons from
Tons from
fore Depletion
Tons
Ledge
Ledge
Ledges
Year
and Taxes
Shipped
No. 4
No. 5
No. 5 and 7
1924
$ 8,387.41
3,021
1925
11,452.86
2,779
1926
34,817.23
3,823
196
1927
19,331.88
3,588
696
1928
28,012.84
4,561
1,414
1929
36,139.36
5,080
1,754
1930
2,249.48
2,092
660
1931
6,748.08
1,203
752
1932
Loss
775
338
1933
20,243.21
2,668
1,644
1934
12,192.82
2,233
1,266
1935
19,633.60
2,353
1,133
1936
18,530.46
2,791
1,350
1937
21,611.71
3,247
1,703
1938
575.00
1,316
481
1939
12,782.73
2,336
875
647
1940
11,834.91
2,343
1,110
1,117
1941
49,138.62
4,510
2,332
2,118
1942
44,358.98
3,929
2,399
1,525
1943
26,510.72
3,040
2,282
760
1944
21,495.43
3,387
2,144
1,021
1945
16,004.60
3,100
2,183
1,031
1946
22,044.53
3,552
2,492
1,061
1947
34,940.39
3,567
2,727
839
Opinion VAN FOSSAN, Judge: The petitioners claim that they are entitled to a deduction in 1941 for depletion under sections 23 (m) and 114 (b) (2) of the Internal Revenue Code *122 [1] with respect to three deposits of sandstone from which grindstone was recovered. Depletion on the discovery basis is limited by section 114 (b) (2) to "mines (other than metal, coal, or sulphur mines)". The petitioner and his brother throughout their testimony referred to the operations as quarries. The lease on the property on which Quarries No. 5 and No. 7 are located gives petitioner the right "to quarry and manufacture grindstone" on the premises leased. Each of the operations was described and designated as a "quarry." *123 In Dunn & Baker, Inc., 30 B.T.A. 663, affirmed 80 Fed. (2d) 1010, it was held that the term "mines" as used in the statute was not intended to include rock quarries. See also Ozark Chemical Co. v. Jones, 125 Fed. (2d) 1, certiorari denied, 316 U.S. 695; Grand River Gravel Company, 22 B.T.A. 1124, Parker Gravel Co., 21 B.T.A. 51. Arrel v. Gentsch, (D.C.N.D., Ohio) 52 F. Supp. 635, cited by petitioners is distinguishable. In reaching its conclusion that a so-called limestone quarry was a limestone mine within the meaning of section 114 (b) (2) of the Revenue Act of 1936, the Court pointed out that in 1928 when the limestone deposit was discovered on the taxpayer's property an underground operation or drift mine was the only known method of removing the limestone, but that, due mainly to the development of the steam shovel, the method of recovering limestone in that state had undergone the same evolution as had the method of recovering coal, that while at first it was recovered by a drift or underground operation, must of its was later recovered by open excavation or stripmining. We have no *124 such evidence herein. That grindstone may be classifiable as a mineral, and section 19.23 (m) (1) (d) of Regulations 103 defines the term "minerals" as including such non-metallic substances as abrasives, does not establish the operation of recovering grindstone as a mine. In Parker Gravel Co., supra, it is stated as follows: "It is apparent, we think, that Congress no more intended the word 'mines' as used in this statute to include 'other natural deposits' than it was intended to include oil and gas wells or timber. We can not assume that Congress was engaged in idle expression when it employed the words 'oil and gas wells' and 'other natural deposits' in association with the word 'mines,' and in order to give meaning to all of the words used, it is obvious that the word 'mines' must be read in its restricted sense as including only what is generally included under the word 'minerals.'" "If it be held that the word 'mines' is here used in its broad sense to embrace a gravel pit, it must be held that gravel in the same sense is a 'mineral.' We would then be unable to attach any significance to the words 'other natural deposits' used in the statute, since any natural *125 deposit is within the broad meaning of the word a 'mineral' and an excavation to recover such mineral is a 'mine.' Water, in the broad sense of the word, is a mineral, and a well in that sense might then be called a 'mine' but certainly the word 'mine' is not generally so understood. If such a construction be given to the statute, not only would the words 'other natural deposits' have no meaning or effect, but a direct conflict in terms would result, for the reason that there could be no natural deposits other than mines. If Congress had intended such meaning, the statute could easily have been framed to read: 'mines, including oil and gas wells, and other natural deposits,' but we can not supply what has been thus omitted. * * *" We conclude that petitioners' stone quarry does not qualify as a "mine" and hence that they are not entitled to use discovery value as a basis for depletion. But assuming arguendo that the operations were mines, the petitioners, under the statute, are required to show, first, that there was a discovery and the date thereof. The term "discovery" is defined in section 19.23(m)-14(b) of Regulations 103 as follows: "(b) A mine or minerals of a kind not *126 excepted by this section may be said to be discovered when (1) there is found a natural deposit of mineral, or (2) there is disclosed by drilling or exploration, conducted above or below ground, a mineral deposit not previously known to exist and the existence of which was so improbable that such deposit had not and could not have been included in any previous valuation for the purpose of depletion, and which in either case exists in quantity and grades sufficient to justify commercial exploitation." The same definition was contained in all regulations [2] issued under prior revenue acts beginning with the Revenue Act of 1918, (section 214 (a) (10)) when discovery depletion was first allowed. On careful study of the evidence we are unable to find that petitioner made a discovery as above defined. The evidence adduced also fails to establish a particular or approximate date when exploration and development *127 in any of the three deposits reached a point indicating a discovery of grindstone in quantity and grades sufficient to justify commercial exploitation. Nor have the petitioners established the fair market value of each deposit involved as required by the statute. The petitioners contend in their brief that the ledge in Quarry No. 5 and the ledge in Quarry No, 7 each contained 25,312.5 tons of recoverable commercial grindstone and that the ledge in Quarry No. 4 on the Morris land contained 48,750 tons of recoverable commercial grindstone. These figures were apparently obtained from calculations, not disclosed in the record, which employed estimates of the length, width and thickness of each ledge, the percentage of commercial grindstone recoverable from any ledge of sandstone, and the weight of a cubic foot of sandstone, made by petitioner's brother at the instigation of petitioner's counsel. The record fails to disclose the basis of such estimates, except that the length of the ledge in Quarry No. 5 was ascertained by pacing off its visible outcroppings. In view of the experience of petitioner and his brother over a period of many years which disclosed the irregularity in quality *128 and quantity of grindstone deposits in sandstone and the failure of a substantial number of the grindstone deposits opened and operated as quarries, we can not accept such estimates without some showing of a reasonable basis therefor. That the ledge in Quarry No. 7 was of the same dimensions as the ledge in Quarry No. 5 was, so far as the record discloses, a mere assumption. The fact that a ledge lies below another ledge does not indicate that the two ledges are of the same dimensions. In their brief the petitioners state that the value of the grindstone in the ledge at Quarries Nos. 5 and 7 was $2.71 per recoverable ton at the time of discovery and that the value of such stone in the ledge at Quarry No. 4 was $3.38 per ton at such time. It appears from petitioners' brief that the above values were arrived at by the use of Hoskold's Formula, using a sinking fund rate of four per cent, a rate of return of six per cent, and lives of 30 years for Quarries Nos. 5 and 7, and 20 years for Quarry No. 4, and the amount of $6.32, stated to be the anticipated or prospective profit per ton grindstone recoverable from each of the three ledges involved. The amount of $6.32 used by petitioners *129 in computing the value of each deposit represents the average net profit per ton (before depletion and taxes) realized from the sale of grindstone produced from all the quarries operated during a period of 23 years. Obviously, the average net profit per ton realized from the sale of grindstone taken from all the quarries operated during a period of 23 years is not a proper factor to be used in computing the value of each of three deposits, differing in quality, manufacturing use, and price. No evidence was adduced showing the income received from the operation of each of the quarries involved. This is also essential as the depletion allowance is limited to 50 per centum of the net income from the property upon which the discovery was made. Furthermore, section 23 (m) provides that in the case of leases the deduction of depletion shall be equitably apportioned between the lessor and lessee. The properties on which the quarries involved were located were leased. Upon the record made, such an apportionment can not be made between petitioner and his lessors. The burden rests upon the taxpayer to show that he is entitled to the deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435; *130 Brown v. Helvering, 291 U.S. 193; Helvering v. Taylor, 293 U.S. 507. This the petitioners have failed to do. The allowance of a deduction for depletion on the discovery basis must, therefore, be denied. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(m) Depletion. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be devised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. * * *
SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. * * *
(b) Basis for Depletion. - * * *
(2) Discovery Value in Case of Mines. - In the case of mines (other than metal, coal, or sulphur mines) discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost. The depletion allowance under section 23(m) based on discovery value provided in this paragraph shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance under section 23(m)↩ be less than it would be if computed without reference to discovery value. Discoveries shall include minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract by the taxpayer after February 28, 1913, if the vein or deposit thus discovered was not merely the uninterrupted extension of a continuing commercial vein or deposit already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.
2. Regulations 101, sec. 23(m)-14(b). Regulations 94, sec. 23(m)-14(b). Regulations 86, sec. 23(m)--14(b)↩. Regulations 77, sec. 234(b). Regulations 74, sec. 240(b). Regulations 69, sec. 220(b). Regulations 65, sec. 220(c). Regulations 62, sec. 219(c). Regulations 45, sec. 219(b).